<u>AFFIDAVIT IN SUPPORT OF</u>
<u>APPLICATION FOR SEIZURE WARRANTS</u>

I, David Kukura, being first duly sworn under oath, states that the following is true and correct to the best of my knowledge:

<u>INTRODUCTION</u>

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for over 29 years. I am a Certified Public Accountant, and prior to joining the FBI, I worked for a public accounting firm. As a Special Agent, my duties and responsibilities have included conducting criminal investigations of individuals and business entities for possible violations of federal laws, particularly those laws found in Title 18, United States Code. From November 1989 to June 2015, I was assigned to the FBI's Minneapolis, Minnesota, office, during which time I was assigned to a White Collar Crime squad with responsibility for investigating violations such as Mail Fraud, Fraud By Wire, Bank Fraud, and Money Laundering, including investigations which resulted in the seizure and forfeiture of money and property which were the proceeds of unlawful activity. Since early July 2015, I have been assigned to the FBI's Chattanooga, Tennessee, office where I have been assigned to work primarily on White Collar Crime investigations.

2.      I have experience in the execution of financial documentary search warrants, the debriefing of defendants, witnesses, informants and other persons who have knowledge of the amassing, spending, converting, transporting, distributing, laundering and concealing the proceeds of illegal activities.  In connection with my official duties as a Federal Law Enforcement Officer, I have been assigned or assisted with investigations involving tax fraud, mail fraud, wire fraud, bank fraud, money laundering and other financial fraud in violation of

Titles 18, 26 and 31 of the United States Code. Many of the investigations in which I have participated have resulted in the arrest, prosecution and conviction of individuals who have committed these crimes.

3. This affidavit is made in support of an application for the issuance of seizure warrants with respect to the bank accounts and vehicle listed below, all of which contain funds that consist of proceeds from fraud and government theft offenses or are traceable to such proceeds submitted in support of a seizure warrant for the following:

    a. funds up to the amount of $399,925.68 in account number 1000193109351 at SunTrust Bank, account name Fatima Sadruddin;

    b. funds up to the amount of $397,000.00 in account number 1000184878758 at SunTrust Bank, account name Fatima Sadruddin;

    c. funds up to the amount of $18,600.00 in account number 1000225674083 at SunTrust Bank, account name Fatima Sadruddin "Grocery";

    d. a white 2017 Ford F-150 pickup truck, VIN 1FTEW1EG1HFB85829;

    e. funds up to the amount of $302,000.00 in account number 7201420655 at Wells Fargo Bank, account name Service At Convenience LLC;

    f. funds up to the amount of $439,838.00 in the account of Karim or Rehana K. Sadruddin at Fifth Third Bank, account number 7900817623;

    g. funds up to the amount of $243,918.50 in the account of Karim or Rehana K. Sadruddin at Fifth Third Bank, account number 9931415625; and

    h. funds up to the amount of $431,390.13 in the account of Rehana K. Sadruddin at Fifth Third Bank, account number 9931926407.

4. Based on my training, experience, and background as a Special Agent for the FBI and the facts set forth below, I have probable cause to believe that:

    a. Karim Sadruddin and his brother Rahim Sadruddin, a.k.a. Rahim Ali (hereinafter referred together as "the Sadruddins"), have committed violations of 18 U.S.C. §

1343 (Wire Fraud), 18 U.S.C. § 1031 (Fraud Against the United States), 18 U.S.C. § 666 (Theft

Concerning Programs Receiving Federal Funds), 18 U.S.C. § 1957 (Money Laundering), and 18

U.S.C. § 371 (Conspiracy to Commit an Offense or to Defraud United States). In particular, there

is reasonable cause to believe that the Sadruddins have perpetrated grant fraud against a

department of the State of Tennessee; as well as grant and contract fraud against agencies/entities

of the federal government. In or about June 2017, acting through one of their corporations, the

Sadruddins obtained a $3 million economic development grant from the State of Tennessee's

Department of Economic and Community Development (ECD) to purchase and renovate a

proposed textile manufacturing facility in Pikeville, Tennessee. In order to gain the state grant

funds, the Sadruddins submitted false invoices and a false wire transfer record as purported proof

that they had incurred costs associated with the renovation of the manufacturing facility. In or

about November 2017, acting through another business entity, the Sadruddins fraudulently

obtained an approximately $30 million contract from the Federal Emergency Management

Agency (FEMA) to supply tarps, including tarps for hurricane victims in Puerto Rico. The

contract required (1) that the tarps meet size and material specifications, and (2) that the tarps be

in compliance with the Trade Agreements Act (TAA) which prohibited tarps manufactured in

China, among other countries. Between November 2017 and January 2018, the Sadruddins

supplied FEMA with about 58,000 tarps, at least some of which were made in China and that did

not meet the contract specifications. The Sadruddins' claims for payment included fraudulent

documents that purported to show that the tarps had been made in Taiwan and transported to

China, but had not been manufactured in China. FEMA paid the Sadruddins about $3.7 million

before FEMA suspended the contract. In or about June 2018, acting through one of their

corporations, the Sadruddins obtained a $230,000 performance grant from the Tennessee Valley Authority (TVA), the proceeds of which were to be used for the proposed textile manufacturing facility in Pikeville, Tennessee. The Sadruddins obtained the TVA grant funds by falsely representing that the Pikeville facility had become commercially operational, and falsely explaining use of the TVA grant funds; and

      b.     funds obtained as a result of these fraud schemes are traceable to the accounts and vehicle set forth in paragraph 3.

5.     The following information is based on my own personal observations and knowledge, as well as information provided by Agents/Investigators from the Department of Homeland Security – Office of Inspector General (DHS-OIG), the Tennessee Valley Authority – Office of Inspector general (TVA-OIG), the Tennessee Bureau of Investigation (TBI), and the Tennessee Comptroller of the Treasury (TCOT); interviews conducted with witnesses; and from documents and sources noted herein. This affidavit does not contain all of the information known to law enforcement regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

PROBABLE CAUSE CONCERNING FRAUD

6.     Beginning in or about April 2017 and continuing until in or about January 2019, the Sadruddins engaged in a conspiracy to defraud the State of Tennessee and the federal government. Karim Sadruddin's wife is Rehana Sadruddin, and Rahim Sadruddin's wife is Fatima Sadruddin. The Sadruddins controlled and operated various business entities, including Master Group USA LLC (MGUSA), Textile Corporation of America LLC

Page 4 of 27

(TCA), and Textile Mill Direct Inc. (TMD). Business bank accounts for these entities, as well as personal accounts for the Sadruddins and their wives, were maintained at Regions Bank. All of the business accounts at Regions Bank have been closed, and therefore, a seizure warrant is not being sought for these Regions Bank business accounts. Karim and Rehana Sadruddin controlled a business entity called Service At Convenience LLC (SAC) and maintained a business account for SAC at Wells Fargo Bank. Karim and Rehana Sadruddin also maintained personal accounts at Fifth Third Bank. Fatima Sadruddin maintained personal accounts at SunTrust Bank. The Sadruddins, doing business as TCA, obtained grant funds from the State of Tennessee's Department of Economic and Community Development (ECD) and the Tennessee Valley Authority (TVA), an entity owned by the United States government, for a textile manufacturing plant in Pikeville, Tennessee. The Sadruddins, doing business as MGUSA, were awarded a $30.7 million contract with the Federal Emergency Management Agency (FEMA) to deliver 475,000 self-help tarps to victims, such as those in Puerto Rico, affected by the 2017 hurricanes. The investigation has determined that the Sadruddins, operating as both MGUSA and TCA, perpetuated fraud against both the federal government and the State of Tennessee.

7.      The FBI, TBI, and TCOT have been investigating a fraud involving a grant issued by the State of Tennessee's Department of Economic and Community Development (ECD). The Tennessee grant fraud investigation began in June 2018, based on information from a reliable Confidential Human Source (CHS) who advised that the Sadruddins perpetrated a fraud involving a $3 million grant from ECD for the purchase and renovation of a building in Pikeville, Tennessee, which was to be used as a textile manufacturing plant. According to the CHS, the

Sadruddins hired Cagle Development (an entity not owned or operated by the Sadruddins) to perform the renovation work on the building; and Karim Sadruddin, acting on behalf of TCA, submitted a fictitious Cagle Development invoice dated August 26, 2017, and a fictitious Regions Bank wire transfer record to the state in order to fraudulently obtain a $1,406,000 reimbursement check from the grant funds for renovation work allegedly completed on the building. However, as of the date of the invoice, the work reflected on the invoice had not been completed. The investigation subsequently confirmed the CHS's information, and also determined that a second fraudulent Cagle Development invoice dated November 3, 2017, in the amount of $806,100 for work allegedly done on the building, was submitted by Karim Sadruddin on behalf of TCA to the grant administrator in order to obtain additional grant funds. Cagle Development records indicate that only about $477,333 was actually received from the Sadruddins for the renovation of the building.

8.     Based on interviews with witnesses, the Sadruddins proposed establishing a textile plant in Pikeville, Tennessee, and claimed that the operation would employ approximately 1,000 people. In or about April 2017, representatives of ECD and TVA met with the Sadruddins and others, and explained the types of incentives, such as grants, which may be available for the project. The ECD representative explained the types of things which state grant funds could and could not be used for. The ECD representative also explained the grant process, that these were all "reimbursable" grants, and how the flow of funds worked; that is, ECD's grant funds flow through the local community's Industrial Development Board (IDB) to the company (in this case TCA) as a reimbursement of eligible expenses, such as purchasing the building or improvements to the building. The ECD representative further explained to the Sadruddins that the company

submits an invoice and proof of payment for an eligible expense to the IDB which sends these records to ECD, and ECD then sends money to the IDB which uses the money to reimburse the company.

9. On May 9, 2017, TCA submitted a "Tennessee Application for Incentives" which ECD utilizes in determining eligibility for various state economic development programs. TCA's application indicates that TCA was applying for a Fast Track Job Training Assistance Program and a Fast Track Economic Development Grant. The application was submitted by "Karim Sadruddin, Manager."

10. In June 2017, ECD offered a $3 million Fast Track grant incentive package to the Bledsoe County Industrial Development Board (IDB), which in turn would disburse the grant funds to TCA. The $3 million grant was to be used for the purchase and renovation of the building located in the city of Pikeville, Bledsoe County, Tennessee, which TCA would use as its textile manufacturing facility. $850,000 was to be used for the purchase of the building, and the remaining funds were to be used for the renovation of the building. The IDB engaged the services of the Southeast Tennessee Development (SETD) to assist in administering the grant. Grant funds were not advanced to TCA for the purchase and renovation of the building. Instead, TCA had to buy the building with its own funds, or pay for an approved expense associated with the renovation of the building, and then submit a claim for reimbursement by providing an invoice and proof of payment. TCA engaged the services of Cagle Development to assist with the initial purchase and subsequent renovation work on the building.

11. On August 1, 2017, Rahim Sadruddin called the Director of SETD and asked what a Fast Track contract and request for reimbursement looked like, and in response, the

Director emailed an example of a contract and request for reimbursement. The Director sent the email to both Karim and Rahim Sadruddin.

12.     On August 25, 2017, Rahim sent an email to the Director of SETD asking to schedule a phone call to discuss how TCA was currently making payments to their general contractor and to be sure that exact records were being kept to turn in for reimbursement. I have interviewed the Director of SETD who informed me that during a subsequent telephone conversation with the Sadruddins, they talked about the example which the Director had emailed to the Sadruddins on August 1, 2017, and the Director explained to them that they had to submit invoices and proof of payment in order to get reimbursed.

13.     On October 3, 2017, Karim Sadruddin sent an email to a representative of SETD, the mayor of Bledsoe County, and Rahim Sadruddin, to which Karim Sadruddin attached an alleged Cagle Development invoice dated August 26, 2017, in the amount of $1,406,900, and a purported wire transfer record reflecting a transfer of $1,406,900 on September 14, 2017, from TCA's account at Regions Bank ending in -7570 (account -7570 is actually associated the MGUSA's Regions Bank account, and is believed to be a typo associated with this fraudulent document) to Cagle Development's account at SunTrust Bank. The investigation has determined that the alleged Cagle Development invoice is fraudulent and was not issued by Cagle Development. The purported wire transfer record appears to be an email from Regions Bank to Karim Sadruddin with the subject "Outgoing Funds Transfer Debit Information TRN 170914-008066." (Regions Bank has since advised the DHS-OIG agent that this email confirmation is fraudulent and that Regions Bank records do not show that a wire for the aforementioned amount was processed). In his October 3, 2017, email, Karim Sadruddin references the alleged invoice

and wire transfer record by stating, in part, "Please see attached invoice and backup for the 1st draw request... Please let us know when the funds will be released, we have a finance meeting this week and I would like to update everyone on where we stand."

14. On November 8, 2017, the IDB issued two checks to TCA in the amounts of $850,000 and $1,406,900. The $850,000 check was to reimburse TCA for the purchase of the building, and the $1,406,900 check was for reimbursement of expenses associated with the renovation of the building. I have interviewed the Mayor of Bledsoe County who informed me that he called Karim Sadruddin to inform Karim Sadruddin that the checks were ready, and Karim Sadruddin then drove from Atlanta to Pikeville, Tennessee, to pick up the checks. The following day, November 9, 2017, the checks, totaling $2,256,900, were deposited to TCA's bank account ending in -1663 at the Regions Bank branch in Suwanee, Georgia. The account balance at the time of deposit was $500.

15. From November 16, 2017, through November 20, 2017, a total of $483,480.00 was transferred from TCA's Regions Bank account -1663 to MGUSA's Regions Bank account - 7570. During this period, wire transfers totaling $308,080 were paid from MGUSA's account - 7570 to recipients who are known to the DHS-OIG agent as companies associated with the acquisition of tarps on behalf of MGUSA to fulfill the aforementioned FEMA contract. Thus, Karim Sadruddin's October 3, 2017, email referenced in paragraph 13 above aided in the fraud perpetrated against FEMA, as well as the State of Tennessee, because the email resulted in the disbursement of grant funds to TCA, and a portion of these fraudulently obtained grant funds were then utilized by the Sadruddins to acquire tarps which the Sadruddins falsely claimed met TAA compliance.

16.     On November 29, 2017, Karim Sadruddin sent an email to a representative of SETD and to Rahim Ali, a.k.a. Rahim Sadruddin, to which Karim Sadruddin attached an alleged Cagle Development invoice in the amount of $806,100 and a Domestic Wire Transfer Request/Authorization showing a transfer of $806,100 on November 15, 2017 from TCA's Regions Bank account -1663 to Cagle Development's account at SunTrust Bank. In the email, Karim Sadruddin stated, in part, "Please see attached the paperwork for the next draw for the work performed at the building. Please review and confirm. Please let me know when you think this can be funded?" The investigation has determined that this second Cagle Development invoice is also fraudulent; and according to Cagle Development records, the actual purpose of the $806,100 was to repay the lender who had loaned TCA the money to purchase the Pikeville building, and not for the renovation of the building.

17.     According to the DHS-OIG agent, from  December 14, 2017 through January 3, 2018, a total of $1,250,121 was paid from TCA's Regions Bank account -1663 to companies which are known to the DHS-OIG agent as businesses associated with, or believed to be associated with, the acquisition of tarps on behalf of MGUSA to fulfill the aforementioned FEMA contract.

18.     On January 5, 2018, the IDB wired $728,100 to TCA's Regions Bank account -1663. This amount was less than the $806,100 requested by Karim Sadruddin for reimbursement because only $728,100 of the original $3 million in grant funds were still available for disbursement.

19.     According to the DHS-OIG agent, from January 16, 2018, through February 2, 2018, a total of $833,541.05 was paid from TCA's Regions Bank account -1663 to companies

associated with, or believed to be associated with, the acquisition of tarps on behalf of MGUSA to fulfill the aforementioned FEMA contract; and in total, it is believed that approximately $1,033,754.29 of the $3 million ECD grant was used towards the purchase of tarps. Thus, the $728,100 wire transfer referenced in paragraph 18 aided in the fraud on FEMA, as well as the fraud on the State of Tennessee, because the fraudulently obtained grant funds were utilized, at least in part, by the Sadruddins to acquire tarps which the Sadruddins falsely claimed met TAA compliance.

20.     A review of both TCA and Cagle Development's bank account records do not reflect the alleged wire transfer of $1,406,900 on September 14, 2017. This confirms that the wire transfer record submitted by Karim Sadruddin to obtain a reimbursement of $1,406,900 in expenses associated with the renovation of the Pikeville building is, in fact, fraudulent.

21.     An investigator with TCOT has reviewed the bank records for accounts controlled by the Sadruddins, such as personal accounts, TCA, and MGUSA. This review determined that a large portion of grant funds were diverted to pay for other expenses billed to TCA by Cagle Development; for expenses which were incurred by the Sadruddins related to the operations of their other enterprises, specifically MGUSA and TMD; or for the payment of personal expenses. As stated in paragraphs 15 and 17, a portion of the fraudulently obtained grant funds were also utilized by the Sadruddins to acquire tarps for the FEMA contract.

22.     The Sadruddins obtained a $230,000 performance grant from TVA for the Pikeville facility. On January 9, 2018, Rahim Sadruddin sent an email to a TVA employee stating that "we are in operation from this week onwards at Pikeville and want to get in touch with you regarding the grant funds." On May 4, 2018, Rahim Sadruddin sent an email to the

TVA employee in which Rahim Sadruddin represented that the Pikeville facility had "reached Commercial Operations meeting the entirety of the definition below", and this definition included, among other things, that plant construction is complete, testing is complete, and the plant is regularly producing goods or services for sale. On June 13, 2018, Karim Sadruddin signed a Commercial Operation Date Certification and a Performance Grant Agreement for the $230,000 TVA grant. In the certification, Karim Sadruddin indicated that the plant was commercially operational as of March 1, 2018. The investigation has determined that these representations by the Sadruddins were false because the Pikeville facility was not commercially operational as a textile manufacturing plant. No textiles were being produced, and the Sadruddins were actually using the facility as a warehouse and repackaging/distribution center for tarps and other textiles. I have interviewed the aforementioned TVA employee who advised me that the plant was supposed to be manufacturing/sewing textiles, not a warehouse, and that a critical part of TVA providing the grant funds was that the plant was commercially operational in the entirety of the definition; and if the plant was not commercially operational in the entirety of the definition as of May 4, 2018, then the Sadruddins should not have obtained the TVA funds.

23. On May 29, 2018, Rahim Sadruddin sent the TVA employee an email which included an attachment titled "TVA Performance Grant Questionnaire." The TVA employee expected the grant funds to be used for the business or facility in Pikeville, and on the attached questionnaire, Rahim Sadruddin falsely represented the "use of funds for the Performance Grant" as "purchasing, installing, or upgrading software, communications/computer equipment, interior fixtures, equipment, machinery, or materials for existing facilities." On July 2, 2018,

TVA transferred $230,000 in grant proceeds to TCA's Regions Bank account -1663. I have reviewed the bank account records and summaries of TCA, MGUSA, TMD and other businesses, as well as the personal bank account records of the Sadruddins and their spouses. Based on my review, the TVA grant funds were not spent as represented by Rahim Sadruddin, and instead the funds were spent primarily on personal expenses, including furniture and payments toward the purchases of their personal residences. On July 3, 2018, $228,000 was transferred from TCA's Regions Bank account -1663 to TMD's Regions Bank account -7600. On July 30, 2018, $100,000 was transferred from TMD's Regions Bank account -7600 to the Service at Convenience LLC (SAC) account ending in 0655 at Wells Fargo Bank, an account controlled by Karim and Rehana Sadruddin. On July 31, 2018, $90,000 was wired from SAC's Wells Fargo Bank account –0655 to the account of the closing agent for the purchase of Karim and Rehana Sadruddins' residence in John's Creek, Georgia.

24.     A DHS-OIG agent informed me that through the use of fraudulent documentation (to include a falsified wire transfer record and shipping record), the Sadruddins, while representing MGUSA, were awarded a firm-fixed $30.7 million contract on November 9, 2017 with the Federal Emergency Management Agency (FEMA) to deliver 475,000 self-help tarps to victims, such as those in Puerto Rico, affected by the 2017 hurricanes; and ultimately, MGUSA provided FEMA with tarps that violated Country of Origin requirements specified by the contract under the Trade Agreements Act (TAA) and further violated the contract by delivering tarps that did not meet the manufacturing specifications as outlined in the Statement of Work. The investigation has determined that in furtherance of the above, the Sadruddins, through MGUSA and TCA, fraudulently misused approximately $1,400,000 of a $3 million State of

Tennessee economic development grant to source and facilitate the purchase of FEMA tarps as described below.

25.     The DHS-OIG agent informed me that from November 23, 2017 through January 25, 2018, FEMA received and took delivery of 58,324 tarps from MGUSA and subsequently paid MGUSA a total of $3,774,895.76 before suspending the contract to review product origin and specifications.

26.     The DHS-OIG agent informed me that on November 23, 2017, MGUSA, following up on a request from FEMA to prove product origin,[1] emailed shipping and billing documents to FEMA claiming that the initial shipment of tarps was manufactured and loaded in Taipei, Taiwan, and necessarily shipped to Shanghai, China, at a cost of $33,136. Subsequently, DHS-OIG determined, through the use of physical and database searches, that the shipping/logistics company identified by name and address on the documents does not exist at the California addresses listed on the documents, nor is it believed to be a registered company in the state of California; as such, the shipping documents are believed to be fraudulent.

27.     The DHS-OIG agent informed me that on March 8, 2018, MGUSA emailed FEMA and provided several documents to include MGUSA Purchase Orders and Regions Bank Wire Transfer Receipts from MGUSA's Regions Bank account ending in -7570. These documents were submitted to prove MGUSA's compliance with contractual requirements, specifically that

---

[1] Product origin is germane to the FEMA contract as the contract requires adherence to the FAR 52.225-5 Trade Agreements Act (TAA). The TAA delineates designated countries with whom the United States has approved trade agreements for the purpose of procuring goods and services to fulfill government contracts. Accordingly, by signing the contract, MGUSA agreed to provide tarps only from countries that were TAA designated. China is not a designated country with whom the United States has an approved trade agreement; accordingly, MGUSA was precluded from obtaining tarps from China.

the tarps meet TAA compliance. As a result of DHS-OIG subpoenas, DHS-OIG determined that MGUSA provided FEMA with a fraudulent wire receipt from Regions Bank, dated November 13, 2017, in the amount of $33,136. MGUSA had submitted the wire receipt as proof the company paid to transport tarps from Taiwan, the alleged place of origin, to Shanghai, China, as a means of shipping expediency. DHS-OIG reviewed the Regions Bank subpoena results and determined that the aforementioned amount was never wired from the account specified on the submitted wire receipt, and the wire receipt appeared fraudulent.

28.     The DHS-OIG agent informed me that upon review of the Federal Input Message Accountability Data reference number listed on the wire receipt, DHS-OIG learned from Regions Bank that the number matched information from an actual MGUSA wire transfer processed by Regions Bank on February 13, 2018, in the amount of $552,474 funded to Mushtaq Ramzan Trading LLC, Dubai, United Arab Emirates.

29.     On October 18, 2018, a DHS-OIG agent and I interviewed one of the tarp suppliers that MGUSA used to fulfill the FEMA contract.  This supplier also provided law enforcement with records related to the tarps supplied to MGUSA. This supplier advised that Karim Sadruddin wanted help with an urgent, large order of tarps for a FEMA contract. Karim wanted the tarps to be from a TAA compliant country, but the supplier explained to Karim that a factory in China was the only source which could produce the tarps in the needed time period, and after a couple of days, Karim Sadruddin agreed to take the tarps from China. According to the supplier, the supplier and Karim Sadruddin actually visited the Chinese factory on December 9, 2017. Karim Sadruddin visited the factory because he wanted to understand that the factory could deliver the tarps in time since the contract with FEMA set forth specific dates

to deliver tarps. The supplier also spoke to Rahim Sadruddin about the tarps being manufactured in China, and these conversations were related to the first order of tarps which were sent to Puerto Rico. They discussed the first Puerto Rico shipment, and subsequent shipments to manage payment of product. The Sadruddins wanted the product coming out of China, and they discussed the factory in China, and the factory's ability to meet deadlines. Much of the supplier's information has been corroborated and found to be reliable. In addition to his statements, the supplier also provided the FBI with emails, Whats App messages, and text messages. Specifically, a Whats App message sent on November 14, 2017, from Karim Sadruddin in which he questioned the price for the China supplier. The supplier also provided a text Rahim Sadruddin sent to the supplier on November 19, 2017, asking for confirmation that the product in Shanghai was cleared and ready for export by the manufacturer.

30.    As stated in paragraph 23 above, I have reviewed the bank account summaries and records of TCA, MGUSA, TMD, SAC, and other businesses, as well as the personal bank account records of the Sadruddins and their spouses. Based on the review of these bank records and summaries, as well as other evidence collected during the investigation, the vehicle and accounts set forth in paragraph 3 were purchased with funds, or contain funds, traceable to the Sadruddins' fraud schemes as more fully described below.

31.    Funds in the SunTrust Bank accounts of Fatima Sadruddin:

   a.    On February 2, 2018, a FEMA contract payment of $1,284,441.60 was transferred to MGUSA's Regions Bank account ending in -7570. The balance in the account prior to this transfer was only $2,186.14;

b. On February 13, 2018, the FEMA funds in MGUSA's Regions Bank account -7570 were used for a $552,474 wire transfer to a National Bank of Ras Al-Khaimah account belonging to Mushtaq Ramzan Trading LLC with an address in Dubai, account number ending in 9002;

c. On May 15, 2018, $199,990 was wired from the same Mushtaq Ramzan Trading account ending in 9002 at the National Bank of Ra Al-Khaimah to the account of Rahim Sadruddin's wife, Fatima Sadruddin, at SunTrust Bank, account number ending in 9351. The balance in SunTrust account -9351 prior to this transfer was $468.94;

d. On June 11, 2018, $199,935.68 was wired from the same Mushtaq Ramzan Trading account ending in 9002 at the National Bank of Ra Al-Khaimah to the account of Rahim Sadruddin's wife, Fatima Sadruddin, at SunTrust Bank, account number ending in 9351. The balance in SunTrust account -9351 prior to the June 11, 2018, transfer was $200,288.58;

e. On June 18, 2018, a total of $397,000 was transferred from Fatima Sadruddin's SunTrust Bank account -9351 to Fatima Sadruddin's SunTrust Bank account ending in 8758. The balance in her SunTrust Bank account -8758 prior to these transfers was only $2,200.14. From May 15, 2018, to June 18, 2018, only minor deposits and merchant refunds totaling $460.56, and what appears to be Fatima Sadruddin's payroll of $2,012.50, were deposited to her SunTrust Bank account -9351; while check/debit purchases, transfers, and other withdrawals totaling $5,474.56 were made from the account. Therefore, the $397,000 transfer on June

18, 2018, was funded with the wires totaling $399,925.68 received from the Mushtaq Ramzan Trading account ending in 9002 at the National Bank of Ra Al-Khaimah set forth in paragraphs 31.c. and 31.d.;

f. From June 18, 2018 to December 26, 2018, there were only interest deposits totaling $19.30 to SunTrust Bank account -8758. During this same time period, there were several withdrawals from the account including:

    1. a $144,000 official check purchased from the account on December 20, 2018, payable to an individual (initials "T.G."). This is appears to be a payment on a lease/purchase agreement for Rahim and Fatima Sadruddin's residence located in John's Creek, Georgia;

    2. a $30,000 official checks purchased from the account on September 12, 2018, payable to TMD which was deposited to TMD's Regions Bank account ending in 7600 at Regions Bank;

    3. transfers of $26,000 and $2,500 to Fatima Sadruddin's SunTrust Bank account -9351 on December 20, and December 26, 2018, respectively;

    4. transfers of $3,000, $3,600, $6,000, and $6,000 (totaling $18,600) to Fatima Sadruddin's SunTrust Bank account ending in -4083 on September 25, October 3, October 29, and November 7, 2018, respectively. These deposits were comingled with funds from other sources;

g. As of December 26, 2018, there was still $175,111.44 in Fatima Sadruddin's SunTrust Bank account ending in 8758; $5,003.75 in Fatima Sadruddin's

SunTrust Bank account ending in 9351; and $1,131.50 in Fatima Sadruddin's SunTrust Bank account ending in 4083.

32.    White 2017 Ford F-150 pickup truck, VIN 1FTEW1EG1HFB85829:

a.    On December 13, 2017, a FEMA contract payment of $652,579.20 was transferred to MGUSA's Regions Bank account -7570, which had a balance of $27,999.75 prior to the transfer, including $15,000 traceable to ECD grant proceeds and $12,999.75 traceable to a loan from a third party.

b.    On December 14, 2017, $680,000 was transferred from MGUSA's Regions Bank account -7570 to TCA's Regions Bank account -1663. The balance in TCA's Regions Bank account -1663 prior to this transfer was $278,883.30 consisting of funds fraudulently obtained from Bledsoe County as a result of the Tennessee grant fraud. From TCA's Regions Bank account -1663, there were subsequently transfers to companies, including ones known to the DHS-OIG agent as businesses associated with, or believed to be associated with, the acquisition of tarps on behalf of MGUSA to fulfill the FEMA contract.

c.    On or about December 28, 2017, $700,000 was transferred to TCA's Regions Bank account -1663 from MGUSA's Regions Bank account -7570, and this transfer was funded with money received from a FEMA contract payment. The balance in TCA's Regions Bank account -1663 following this transfer was $1,031,221.94 consisting of money received from FEMA contract payments. From TCA's Regions Bank account -1663, there was subsequently a $65,000 wire transfer to AK Textile Mills in Pakistan, as well as transfers to other

companies, including ones known to the DHS-OIG agent as businesses associated with, or believed to be associated with, the acquisition of tarps on behalf of MGUSA to fulfill the FEMA contract.

d. On December 29, 2017, $26,850 was transferred to TMD's Regions Bank account -7600 from MGUSA's Regions Bank account -7570, and this transfer was funded with money received from a FEMA contract payment.

e. On January 5, 2018, a wire transfer of $728,100 (referenced in paragraph 18 above) was received into TCA's Regions Bank account -1663 from Bledsoe County, representing funds fraudulently obtained from the ECD grant, bringing the total balance in TCA's account -1663 to $1,049,706.06; and this balance consisted of funds fraudulently obtained from FEMA and the ECD grant.

f. On January 8, 2018, $60,000 was transferred from TCA's Regions Bank account -1663 to TMD's Regions Bank account -7600. Prior to the transfer, the balance in TMD's Regions Bank account -7600 was $35,298.71, which consisted of $26,850 traceable to a FEMA contract payment set forth in paragraph 32.d. above, co-mingled with $8,448.71 received from a third party, the purpose of which is unknown and may be legitimate.

g. On January 8, 2018, $54,500 was wired from TMD's Regions Bank account -7600 to the bank account of an automobile dealer in Alabama for the purchase of a white 2017 Ford F150 pickup truck, VIN 1FTEW1EG1HFB85829, by Karim and Rehana Sadruddin. According to the retail purchase agreement, $54,500 was

the final price of the vehicle; therefore, the wire transfer paid for the 2017 Ford F150 in full.

    h.    Based on surveillance which I have conducted, I believe the Ford F150 is utilized by Karim Sadruddin and is likely kept at his residence in John's Creek, Georgia.

33.    Funds in the Wells Fargo Bank account of Service At Convenience LLC (SAC):

    a.    On February 2, 2018, a FEMA contract payment of $1,284,441.60 was transferred to MGUSA's Regions Bank account ending in -7570. The balance in the account prior to this transfer was only $2,186.14;

    b.    On March 21, 2018, the FEMA funds in MGUSA's Regions Bank account -7570 were used for a $202,000 cashiers payable to SAC which was deposited to SAC's Wells Fargo Bank, account number ending in 0655. SAC's Wells Fargo Bank account is controlled by Karim and Rehana Sadruddin;

    c.    As referenced in paragraph 23 above, on July 2, 2018, TVA transferred $230,000 in grant proceeds to TCA's Regions Bank account -1663, and $100,000 of the TVA grant funds were ultimately transferred to SAC's Wells Fargo Bank account –0655 on July 30, 2018. Thus, from March 21, 2018, to July 30, 2018, a total of $302,000 in funds obtained fraudulently from FEMA and TVA were deposited to SAC's Wells Fargo Bank account -0655; and during this time, only minor deposits and purchase returns totaling $4,577.59 were made to SAC's Wells Fargo Bank account -0655;

    d.    As of December 31, 2018, there was $1,857.60 in Karim and Rehana Sadruddin's SAC account at Wells Fargo Bank, account ending in -0655.

34.     Funds in the Fifth Third Bank accounts of Karim or Rehana K. Sadruddin:

   a.   From December 13, 2017, to February 2, 2018, FEMA contract payments

        totaling approximately $3,775,895.76 were made to MGUSA's Regions Bank

        account -7570. These FEMA funds were utilized for a $250,000.00 wire transfer

        on March 21, 2018, to the bank account of AK Textile Mills with an address in

        Karachi, Pakistan, account number ending in 5696, with the beneficiary bank

        identified as JS Bank Limited in Karachi, Pakistan (the significance of the AK

        Textile Mills account is more fully described in paragraph 34.c.);

   b.   From December 14, 2017, to January 29, 2018, FEMA funds totaling

        approximately $2,455,750 were also transferred from MGUSA's account -7570

        to TCA's Regions Bank account -1663; and on January 5, 2018, ECD grant

        proceeds of $728,100 (as set forth in paragraph 18 above) were wired to TCA's

        Regions Bank account -1663. On January 3, 2018, and January 18, 2018, wire

        transfers in the amounts of $65,000 and $35,000, respectively, were sent from

        TCA's Regions Bank account -1663 to the bank account of AK Textile Mills,

        account -5696 at JS Bank Limited in Karachi, Pakistan; and the funds remaining

        in TCA's Regions Bank account -1663 at the time of these two transfers were

        from the ECD grant proceeds and/or FEMA contract payments. In addition, on

        March 21, 2018, $313,000, originating from FEMA contract payments, was

        transferred from TCA's account -1663 to TMD's Regions Bank account -7600,

        and these funds in TMD's Regions Bank account -7600 were then used for a

        $180,000 wire transfer on March 23, 2018, to the bank account of AK Textile

Mills, account ending in 5696 at JS Bank Limited in Karachi, Pakistan. Thus, from January 3, 2018, to March 23, 2018, funds totaling $530,000 that the Sadruddins fraudulently obtained from FEMA and/or the ECD grant were wired to the bank account of AK Textile Mills, JS Bank Limited in Karachi Pakistan account ending in 5696;

c. From May 14, 2018, to July 31, 2018, four wire transfers totaling $439,838 were deposited into the account of Karim and Rehana Sadruddin at Fifth Third Bank, account ending in 7623. These wire transfers were received from JS Bank Limited in Karachi, Pakistan, account ending in 5696 (the same account referenced in paragraphs 34.a. and 34.b. above); however, the originator is identified as the Sadruddins' father, Mansoor Sadruddin, rather than AK Textile Mills. The balance in Fifth Third Bank account -7623 prior to the first transfer was only $5.32; and from May 14, 2018, to July 31, 2018, there were miscellaneous cash deposits totaling $3,010, transfers from other Sadruddin personal accounts totaling $1,195, and merchant/debit card returns of about $490, while there were transfers to other Sadruddin personal accounts of about $6,722, as well as fees and merchant/debit card payments of about $6,470;

d. From May 21, 2018, to June 13, 2018, there were transfers of $93,959 and $149,959.50, totaling $243,918.50, from Karim and Rehana Sadruddins' Fifth Third Bank account -7623 to the account of Karim and Rehana Sadruddin at Fifth Third Bank, account ending 5625. The beginning balance at the time of the first deposit was zero, and the only other deposits to Karim and Rehana

Sadruddins' Fifth Third Bank account -5625 during this time was interest of $234.72;

e. On June 28, 2018, a $243,953.22 cashier's check purchased with funds in Karim and Rehana Sadruddins' Fifth Third Bank account -5625 was deposited to Rehana Sadruddins' Fifth Third Bank account ending in 6407;

f. On June 28, 2018, a $147,436.91 cashier's check purchased with funds in Karim and Rehana Sadruddins' Fifth Third Bank account -7623 was deposited to Rehana Sadruddin's Fifth Third Bank account -6407;

g. On July 31, 2018, $40,000 was transferred from Karim and Rehana Sadruddins' Fifth Third Bank account -7623 to Rehana Sadruddin's Fifth Third Bank account -6407. Thus, from June 28, 2018 to July 31, 2018, funds totaling $431,390.13 were deposited to Rehana Sadruddin's Fifth Third Bank account -6407 which can be traced to the funds received from JS Bank Limited in Karachi, Pakistan, account ending in 5696.

35. Insofar as criminal forfeiture is concerned, I know that a protective order would be inadequate to ensure the preservation of the funds in the above-listed bank accounts and the vehicle, because funds stored electronically in bank accounts can be easily and almost instantaneously transferred from remote locations, and that financial institutions do not always act promptly to make all of their employees aware of restraints that are placed on such funds; moreover vehicles can be easily transferred or hidden.

36. Moreover, with respect to civil forfeiture of fungible property, such as funds deposited in an account at a financial institution, I know that it is unnecessary "for the

Government to identify the specific property involved in the offense that is the basis for the forfeiture; and that any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture." 18 U.S.C. § 984.

37.     With respect to the pre-indictment seizure of property, I know that the Court is authorized to issue a seizure warrant if the Court determines there is probable cause to believe that the subject property is forfeitable in the event of the possessor's conviction and that a protective order would be insufficient to assure the availability of the property for forfeiture upon conviction. *See* 21 U.S.C. § 853(f); *United States v. Parrett*, 530 F.3d 422, 429 (6th Cir. 2008) (explaining that the pre-trial restraint of *tainted* assets that are subject to forfeiture is permissible; holding that pre-trial restraint of untainted or substitute assets is unauthorized).

38.     Said bank accounts are subject to seizure to United States pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(e) and (f) by 18 U.S.C. § 982(b)(1) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), on the grounds that the funds contained in the above-listed accounts constitute proceeds that are directly traceable to violations of 18 U.S.C. § 1343. The bank accounts and vehicle are further subject to seizure to United States pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(e) and (f) by 18 U.S.C. § 982(b)(1) and forfeiture pursuant to 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C), on the grounds that the funds contained in the above-listed accounts and the vehicle listed above constitute proceeds that are directly traceable to violations of 18 U.S.C. § 1957. For the reasons set forth above, probable cause exists to seize the properties.

39.     As such, the United States seeks the issuance of warrants providing seizures of the above-listed vehicle and the contents of the above-listed bank accounts which contain funds constituting proceeds or are traceable to proceeds of wire fraud violations and constitute proceeds that are directly traceable to money laundering.

40.     I submit there is probable cause to believe that these accounts contain proceeds of the crimes listed and detailed above.

41.     The events described herein, and the location of the businesses and properties in question occurred and are situated in the Eastern District of Tennessee and elsewhere.

42.     Accordingly, pursuant to 18 U.S.C. § 981(b)(1)(3), "a seizure warrant may be issued . . . by a judicial officer in any district in which the forfeiture action against the property may be filed under section 1355(b) of Title 28, and may be executed in any district in which the property is found." 18 U.S.C. § 981(b)(3).

## CONCLUSION

43.     Based upon all the foregoing information, probable cause exists to believe that Karim and Rahim Sadruddin have committed violations of federal law including conspiracy to commit wire fraud and money laundering. Furthermore, I have probable cause to believe that the funds maintained in the bank accounts and the vehicle listed below are subject to seizure and forfeiture:

   a. funds up to the amount of $399,925.68 in account number 1000193109351 at SunTrust Bank, account name Fatima Sadruddin;

   b. funds up to the amount of $397,000.00 in account number 1000184878758 at SunTrust Bank, account name Fatima Sadruddin;

   c. funds up to the amount of $18,600.00 in account number 1000225674083 at SunTrust Bank, account name Fatima Sadruddin "Grocery";

d.   a white 2017 Ford F-150 pickup truck, VIN 1FTEW1EG1HFB85829;

e.   funds up to the amount of $302,000.00 in account number 7201420655 at Wells Fargo Bank, account name Service At Convenience LLC;

f.   funds up to the amount of $439,838.00 in the account of Karim or Rehana K. Sadruddin at Fifth Third Bank, account number 7900817623;

g.   funds up to the amount of $243,918.50 in the account of Karim or Rehana K. Sadruddin at Fifth Third Bank, account number 9931415625; and

h.   funds up to the amount of $431,390.13 in the account of Rehana K. Sadruddin at Fifth Third Bank, account number 9931926407.


FURTHER THIS AFFIANT SAYETH NOT

David Kukura, Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me this 26th day of February, 2019

Susan K. Lee
United States Magistrate Judge
Eastern District of Tennessee